51 CCPA

ALFRED ELECTRONICS, Appellant,

v.

ALFORD MANUFACTURING COMPANY, Appellee.

Patent Appeal No. 7192.

United States Court of Customs and Patent Appeals.

July 9, 1964.

(Charles R. Allen, Jr., Washington, D. C., of counsel) for appellant.

Charles Hieken, Ezekiel Wolf, Wolf & Greenfield, Boston, Mass., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

Alfred Electronics, owner of two registrations of "ALFRED" for certain electronics equipment, appeals from the adverse decision of the Trademark Trial and Appeal Board in an interference between it and Alford Manufacturing Company, applicant for registration of "ALFORD" for "antennas, high frequency components, such as hybrid junctions, side band filters, baluns, diplexers, slotted lines, r-f switching systems, and high frequency phase shifters."

Alfred's involved registrations, No. 677,965 for "traveling wave tube amplifiers, traveling wave tube power supply, sweeping power supply, and vacuum power controls," and No. 684,034 for "sweeping oscillators, backward wave oscillator panels, levelers, thermocouple gauge controls, and ionization gauge controls" issued on May 5, 1959 and August 25, 1959, respectively, on applications filed on October 22, 1957 and December 22, 1958, respectively. Those applications alleged first use on December 15, 1949. Alford Manufacturing's application, which alleges first use by December 1946, was filed on July 5, 1960, making Alfred the senior party.

The board held that Alford Manufacturing is entitled to the registration for which it has made application and stated that Alfred's registrations will be cancelled in due course.

Both parties filed testimony and documentary exhibits. The evidence of Alford Manufacturing is dealt with in the board's opinion, from which, in view of its thoroughness and accuracy on that point, we quote at length:

"According to testimony adduced in behalf of the junior party, 'AL-

Harvey G. Lowhurst, Palo Alto, Cal., William G. MacKay, San Francisco, Cal.

FORD' is the surname of Andrew Alford, the president of Alford Manufacturing Company and the owner of a majority of the stock of said company. Andrew Alford is a well known, nationally recognized authority and inventor in the television and FM–AM broadcasting antenna field and is the sole or joint owner of some one hundred patents primarily related to antennas and related wave guide devices, including a hyperbolic navigation system and antennas used to transmit signals in station broadcasts to aircraft, a number of which have been known and referred to as 'Alford Loops'. In September 1945, while working part-time at the Radio Research Laboratory at Harvard University, Alford started his own business, a sole proprietorship, under the name, Andrew Alford Consulting Engineers, to engage in rendering consulting engineering services and the broadcasting antenna field. Alford terminated all connections with the Radio Research Laboratory on December 31, 1945 and from January 1946 on, he devoted all his time to his business. Andrew Alford Consulting Engineers first conducted business from Alford's apartment and shortly afterwards from a place in Somerville, Massachusetts. In September 1947, Alford moved to Boston, Massachusetts from which address he has continued to conduct his business. During the years from 1946 through 1948, Andrew Alford Consulting Engineers designed and developed transmitting and receiving antennas and associated equipment for use on aircraft, buses, and the like as well as antennas for color television tests, directional antenna, and similar devices to which were attached nameplates bearing the legend 'Contractor, Andrew Alford Consulting Engineers' or 'Contractor, Andrew Alford'.

"On October 15, 1948, Alford organized the junior party, Alford Manufacturing Company, as a Massachusetts corporation doing business in Boston, Massachusetts at the same address as Andrew Alford Consulting Engineers. The junior party, shortly after its creation, adopted and began using a trademark including the letters 'AMC' or 'AMCI' on the background of what is referred to as a 'Smith Chart'. This mark was prominently displayed on every name plate and catalog employed by the junior party. Beginning at least as early as November or December 1948, when it shipped a television diplexing filter from Boston to the Columbia Broadcasting System in New York City, the name plates affixed by the junior party to its goods have also displayed its corporate name 'Alford Manufacturing Co.' in block lettering above the address 'Boston, Mass.'; and since about July 1955, 'Alford' has been prominently displayed on the nameplates and in advertising catalogs above the words 'Manufacturing Co.', and in a size much more readily discernible than the remaining portion of its corporate name. The junior party, with the exception of two years during the Korean War when its activities which were primarily concerned with commercial needs were curtailed, has been a going concern since its incorporation in the latter part of 1948. It has, since about 1953 or 1954 distributed catalogs describing its equipment to customers and prospective customers, it has advertised its equipment in various trade publications, and it has displayed its products at various conventions and shows, including, the IRE National Convention, the Wescon Show, the National Electronics Conference, and the convention of the National Association of Broadcasters. 'Alford' has been promi-

nently and distinctively featured on all of this material and displays. In addition, its equipment is referred to in invoices by the designation 'Alford' and sales contracts refer to 'Alford Equipment' and the like. The junior party expends about forty-eight thousand dollars a year in advertising its products, which includes the cost of attending and displaying such goods at conventions and shows. Sales of products by the junior party, which have been made for the most part through Manufacturers' representatives in the United States and abroad, amounted to sixty-three and one half thousand dollars in 1949 and over six hundred thousand dollars in 1960.

"Andrew Alford Consulting Engineers and Alford Manufacturing Company have over the years existed as two distinctly different legal entities, the former, a sole proprietorship and the latter, a corporaion. Andrew Alford owns the controlling interest in the junior party, and Andrew Alford Consulting Engineers or, in fact, Andrew Alford, owns most of the facilities used by the junior party and does the actual manufacturing both for his own customers, and also as a subcontractor for the junior party. Andrew Alford Consulting Engineers is engaged primarily in electronic engineering consultation and development work for the government. The junior party manufactures and sells two principal lines of goods intended primarily for commercial as distinguished from governmental users, one line comprising television transmitting antennas and diplexers, vestigial side brand filters, hybrid diplexers, and miscellaneous hardware that goes with the radiating system of television or FM–AM broadcasting systems, and the other line comprising instruments, components, and allied items for radio frequency measurements and systems. The junior party has also from time to time made and sold special equipment in the same field or fields engaged in by Andrew Alford Consulting Engineers."

The board rejected the claim of Alford Manufacturing that use of "ALFORD" by Andrew Alford or Andrew Alford Consulting Engineers inures to its benefit to give it use since December 1946. On the basis that Alford Manufacturing can rely on such use of "ALFORD" as it has made in its own behalf, the board found use of "ALFORD" "as the distinguishing feature of its trade name since about November or December 1948 and in the manner of a trademark since about July 1955."[1]

The board also dealt in detail with the evidence for Alfred, stating:

"The senior party's record discloses that in about 1937 or 1938 two high school friends, Albert Y. Jew and Frederick W. Kruse, formed a partnership under the name of Palo Alto Sound Service, to engage in servicing, building, and selling electronic equipment such as modulators, amplifiers, oscillators, disc recorders, and public address systems. The operations of the partnership were conducted first in their respective parent's garages and later, when they build their own homes, in their adjacent garages. In about 1948, the partnership began to branch more and more into engineering and manufacturing electronic products with less emphasis on the servicing end of the business. At this time, another company was founded by a friend under the name, Palo Alto Radio Service, which was devoted entirely to servicing radio and television sets. In order to better re-

[1.] The board recommended that, should Alford Manufacturing ultimately prevail in the present interference, the Examiner of Trademarks require an amendment to the application of said party correcting the date of first use alleged and eliminating reference in the application to the use by Andrew Alford.

flect the changed character of its business and to avoid any possible confusion with Palo Alto Radio Service, the partners decided to rename their partnership, Alfred Electronics, the prefix 'Al' being taken from the first name of Albert Y. Jew and the latter portion 'Fred' from the first name of the other partner, Frederick W. Kruse. The change of partnership name was effected after a gradual changeover sometime in 1949. The earliest date exhibit of record reflecting the completed change-over to Alfred Electronics is a copy of a seller's permit issued to Alfred Electronics under the California Sales and Use Tax Laws on December 5, 1949. Subsequently, the parties changed the name on the bank account, ordered new stationery forms and stamps, and otherwise conducted business as Alfred Electronics. The business of the new partnership continued along substantially the same lines as the old partnership including television servicing until 1952 when the servicing was discontinued. From 1952 to 1954, the partnership manufactured a large number of medical devices called 'defibrillators' and various microwave devices. In or about 1954 or 1955, the partnership decided to change its activities from special product manufacturing to manufacturing catalog or standard items. Subsequently, it developed and manufactured ionization gauge controls or amplifiers, vacuum power control panels, and other electronic equipment. Starting in late 1949, all products manufactured and sold by the partnership were stamped with the designation:

'Alfred Electronics
Palo Alto, Calif. U. S. A.'
In late 1955, the partnership began to use the notation 'Alfred', per se, in association with its products on data or catalog sheets distributed to customers and prospective customers; and in or before the middle of 1956 it applied 'Alfred', per se, as a trademark on the product nameplates in such a manner as 'Alfred Regulated Power Supply', 'Alfred Microwave Amplifier' and the like. Such use has since been continuous.

"In June 1957, the partnership being conducted under the name, Alfred Electronics, was incorporated as the senior party, Alfred Electronics, a California corporation, and the assets of the partnership including 'its name and goodwill' were transferred to the corporation, the outstanding stock thereof being owned by the former members of the partnership. The corporation is predominately involved in manufacturing and selling broad band microwave instruments and power supplies including sweeping oscillators, sweeping signal generators, microwave levelers, microwave amplifiers and high voltage power supplies (99% of the amplifiers and oscillators sold by the senior party assertedly operate above 1000 megacycles). The business of the corporation has steadily increased. From 1950 through 1955, the senior party's sales totaled seventy thousand dollars and since 1956, such sales have approximated five million dollars. The senior party's products are sold throughout the United States and abroad by manufacturers' representatives who are permitted to carry complementary but not competitive lines of electronic equipment. The senior party has also exhibited its products at the Wescon Show annually since 1956 and at the IRE Show since 1959; and, in addition, it has promoted such goods by distributing catalogs and data sheets and by advertising in trade journals, including, 'Electronics, Design', 'Proceedings of the IRE', and 'Microwave Journal'. The senior party's suppliers and customers have

also referred to or pictured its products in their advertisements. The senior party's total advertising expenditures from 1957 through 1961 approximated one hundred and fifty thousand dollars."

From that evidence, the board concluded that the earliest date supported by the record for use of "ALFRED" is December 5, 1949, which use was only as a trade name. The earliest trademark use of "ALFRED" was found to be no earlier than the latter part of 1955.

More specifically, the board found that trademark use of "ALFORD" resulted in July 1955 from Alford Manufacturing starting, at that time, to display "ALFORD" on the nameplates for its goods in a style of lettering larger than the other portion of its trade name and in such a way as to create a separate and independent impression. In connection with that point, the board cited its previous decision in Lytle Engineering & Mfg. Co., 125 U.S.P.Q. 308.

Appellant questions that ruling, relying particularly on Minn. Mining & Mfg. Co. v. Minn. Linseed Oil Paint Co., etc., 229 F.2d 448, 43 CCPA 746, and In re Hillerich & Bradsby Co., 204 F.2d 287, 40 CCPA 990. However, the former case is readily distinguished from the present since it does not appear that "Minnesota" was accentuated in the corporate name therein. The Hillerich case is an *ex parte* one where the appellant sought registration of an oval in which the trademark "Louisville Slugger" was used and the registration was refused in the absence of proof that the public attached trademark meaning to the mere oval. The larger lettering and clear emphasis on "ALFORD" in Alford Manufacturing's use since about July of 1955 appears to us to substantiate the board's conclusion that trademark use of the term commenced at about that time.

The board further noted the close similarity between "ALFRED" and "ALFORD" and the goods of the two parties and concluded that purchasers are likely to attribute "ALFRED" and "ALFORD" equipment to a common producer.

Alfred classifies the goods of Alford Manufacturing as constituting two different lines, designated as an "Antenna Line (television broadcasting equipment)" and a "Coaxial Component Line (instruments and components)."

It urges in particular that the antenna line, which was involved in Alford Manufacturing's earliest sales, so differs from Alfred's products as to make confusion unlikely. It also points to evidence that Alford Manufacturing selected certain sales representatives already handling Alfred's goods to carry what Alfred terms the coaxial component line and takes the position such evidence is entitled to great weight as an indication that confusion is improbable. Alfred further points to the record as showing that the average prices of products from Alford Manufacturing's antenna and coaxial component lines are $50,000 and $200, respectively, and its own products range from $1,000 to $9,000 with an average of about $2,000. It urges that those facts, along with the considerations that the goods are not competing and are purchased by discriminating engineers, demonstrate there is no likelihood of confusion.

However, we think that, in view of the similarity in "ALFRED" and "ALFORD" and the obviously close relationship of Alfred's goods to both lines of Alford Manufacturing's product, the board's conclusion as to likelihood of confusion is correct.

The board specifically concluded that, "since the junior party [Alford] was the first to adopt its notation and has since continuously used it as the distinguishing feature of its trade name and/or as a trademark, the junior party possesses rights in 'ALFORD' superior to those which the senior party may assert in 'ALFRED.'" It further considered it "well established that the use of a nota-

tion as the salient feature of a trade name creates rights in the user sufficient to preclude the registration by a subsequent user of the same or a similar designation, whether or not the later party's use is that of a trademark," citing Section 2(d) [2] of the Trade-Mark Act and certain decisions [3] of tribunals of the Patent Office.

Alfred takes the position that use of a trade name which is inherently non-distinctive creates no rights in the user until it becomes distinctive. It further urges that Alford Manufacturing is not entitled to an award of priority here because "ALFORD," which is a surname is inherently nondistinctive, has not been shown to have acquired a secondary meaning prior to Alfred's entry into the field and because Alfred's entry in the field before such meaning was acquired precludes the term from subsequently acquiring such secondary meaning.

■ Under Section 2(d), a trademark is not entitled to registration where it so resembles a mark or *trade name* previously used by another as to be likely to cause confusion, or to cause mistake, or to deceive. That section does not specify that a trade name must be inherently distinctive or that it must have acquired a secondary meaning to be effective as a bar to registration and we find no basis for adopting an interpretation imposing such a requirement. We therefore find no error in the board's ruling that Alford Manufacturing's prior use of "ALFORD" in its trade name bars valid registration of "ALFRED."

Alfred's argument regarding absence of proof of secondary meaning of "ALFORD" as a trademark raises the further question whether Alfred is entitled to an adjudication in this interference whether Alford Manufacturing has shown the secondary meaning necessary to entitle it to registration. The board pointed out that Trade-Mark Rule 2.96 in effect during the proceeding and at the time of final hearing therein read:

"* * * The issue in an interference between applications shall be the respective rights of the parties to registration [of the applications, on the basis of *priority of adoption and use.*] The issue in an interference between an application and a registration shall be the same, including, in the case of the registrant, the right to maintain the registration on the same basis, and if the final judgment is adverse to the registrant, the registration will be canceled unless good and sufficient reasons are presented for other action."

(Emphasis provided by the board)

It ruled that in the absence of a pleading to enlarge the scope of the interference as permitted by Trade-Mark Rule 2.97,[4] the primary issue is which of the parties was the first to adopt and use its mark and that whether or not a particular designation, including a surname such as "ALFORD," has acquired a secondary meaning "is of no moment herein."

Not only did Alfred not act under Rule 2.97 to raise the issue whether Alford

2. Section 2 sets forth as a reason for refusing a mark that it
   "(d) Consists of or comprises a mark which so resembles a mark registered in the Patent Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive: * * *."

3. Midwest Homes, Inc. v. Midwest Houses, Inc., 120 U.S.P.Q. 406 (Comr., 1959);

Universal Overall Company v. Stonecutter Mills Corporation, 121 U.S.P.Q. 605 (Comr., 1959); and Zell Products Corporation v. Zell Electric Manufacturing Co., Inc., 126 U.S.P.Q. 520, (TT & A Bd., 1960).

4. Rule 2.97 provides for the filing, within fifty days after the notice of interference is mailed, of a pleading setting forth affirmatively other matters which might show the opposing party was not entitled to obtain or maintain a registration.

Manufacturing is barred from obtaining registration for failure to show secondary meaning, but he additionally failed to move to dissolve the interference under Rule 2.94 [5] on the ground that Alford Manufacturing's mark is not registrable.

It seems to us that the language of Rule 2.96 as it read when applicable to the present proceedings does not require that the matter of secondary meaning of "ALFORD" be considered in the absence of it being raised under the other rules. Neither do we regard such consideration to be required by the Lanham Act.[6] We thus conclude there is no reversible error in the board's action declining to consider the question of secondary meaning for Alford under the present circumstances.

Our conclusion, however, is not to be construed as ruling that "ALFORD" has been shown to have acquired a secondary meaning entitling Alford Manufacturing to the registration sought here. Neither is it to be construed as barring the examiner from giving *ex parte* consideration to the question of secondary meaning or as barring Alfred from raising the question in any proceeding in which it might otherwise have the right to do so.

Since we find no reversible error in the board's decision, that decision is affirmed.

Affirmed.

RICH, Judge (dissenting), with whom SMITH, J., joins.

On the basis of the essential facts stated in the court's opinion bearing on the issue of likelihood of confusion, I respectfully dissent.

For reasons very similar to those which I stated in my opinion for the court in In re General Electric Co., 304 F.2d 688, 691, 49 CCPA 1186 (1962), I cannot see any real likelihood that those who would purchase Alford's antenna and coaxial line components at prices from $300 to $50,000 and Alfred's highly technical microwave and other electronic equipment selling from $1,000 to $9,000 would be confused as to source or anything else by the obvious similarities between ALFORD and ALFRED. There are also obvious differences. Like the marks VULCAN and VULKENE in the General Electric case, one mark, Alfred, is very common as a given name but Alford is relatively uncommon. It immediately strikes the consciousness as distinctly different for that very reason. Compare LUX and SHUX in Lever Brothers Co. v. Producers Chemical Service, 283 F.2d 879, 48 CCPA 744, wherein we found no likelihood of confusion even on cheap consumer products sold off the supermarket shelf.

Since I see no likelihood of confusion, I see no basis for an interference. I would vacate the board's decision and remand for dissolution of the interference.

5. Rule 2.94 reads in part: "(a) Motions to dissolve an interference may be brought on the ground * * * (3) that an applicant's mark is not registrable.
    *    *    *    *    *
"(c) Motions under paragraph (a) or (b) of this section shall be made not later than forty days after the notice of interference is mailed and shall contain a full statement of the grounds relied upon. * * * "

6. Sec. 16. Interference, reads:
    "Whenever application is made for the registration of a mark which so re-sembles a mark previously registered by another, or for the registration of which another has previously made application, as to be likely when applied to the goods or when used in connection with the services of the applicant to cause confusion or mistake or to deceive, the Commissioner may declare that an interference exists. No interference shall be declared between an application and the registration of a mark the right to the use of which has become incontestable" (15 U.S.C. § 1066, as amended by Public Law 87–772, 76 Stat. 769).