NATURAL FOOTWEAR LIMITED,
Plaintiff,

v.

HART SCHAFFNER & MARX AND
ROOTS, INC., Defendants,

and

ROOTS, INC., Counterclaimant,

v.

Don GREEN, Michael Budman, and
Natural Footwear Limited,
Counterclaim Defendants.

Civ. No. 79–2966.

United States District Court,
D. New Jersey.

Aug. 18, 1983.

See also, D.C., 579 F.Supp. 543.

Crummy, Del Deo, Dolan & Purcell, by John T. Dolan, Arnold B. Calmann, and Brian J. McMahon, Newark, N.J., and Baker & McKenzie by Horst Werder and Leslie Bertagnolli, Chicago, Ill., of counsel, for plaintiff and counterclaim defendants.

Stryker, Tams & Dill by William J. Heller, Newark, N.J., and Pattishall, McAuliffe & Hofstetter by Thomas Hofstetter, and Patricia Smart, Chicago, Ill., of counsel, for defendants and counterclaimant.

## MEMORANDUM

BIUNNO, Senior District Judge.

On February 18, 1983, the plaintiff-counterdefendants, Natural Footwear Limited, Don Green and Michael Budman, (hereafter "Natural") filed a motion for partial summary judgment, i.e., for summary judgment on Count 1 of the complaint, seeking an order:

1. To declare that Natural's U.S. trademark registrations are valid and in force; and

2. To direct the Commissioner of Patents and Trademarks to dismiss the Petition for Cancellation, No. 11,602 filed there by the defendant-counter-claimant, Roots, Inc. (hereafter "Roots").

Roots' brief in opposition took the position that rather than being entitled to the partial summary judgment sought, the court should enter a partial summary judgment in favor of Roots and against Natural, directing the cancellation of Natural's two registrations.

When the Natural motion came on for hearing, the court observed that Roots wished to have its *de facto* cross-motion heard on short notice. Roots was then allowed to make that cross-motion orally, at the start of the hearing on the Natural motion, as allowed by F.R.Civ.P. 7(b)(1). The two motions were heard together, without objection, as shown by the transcript of March 14, 1983 pages 2 and 3.

The parties also agreed in their briefs to the proposition that the court is authorized, under 15 U.S.C. § 1119, to determine the right to registration and also to order the cancellation of registrations, in any action involving a registered mark. The section also provides that such orders are to be certified for appropriate entry on the trademark office records.

These cross-motions for partial summary judgment are thus directly opposed, and the parties diverge on the question whether Roots may successfully oppose Natural's registrations without establishing a secondary meaning for the word "Roots", which the opposing parties both use.

The general background is outlined in the memorandum dated December 4, 1979 granting Roots' application for preliminary injunction, later affirmed by the Court of Appeals, 620 F.2d 289 (CA–3, 1980).

Roots began as a family store, continued by the son, Perry Root, incorporated, then sold to Hart, Schaffner & Marx in about 1965 along with the right to use the name "Roots", and now continues as a wholly owned subsidiary under the management of Perry Root. The Roots stores sell wearing apparel of all kinds, and accessories, both for men and women, aimed at a quality-conscious clientele.

While it does no manufacturing, it has its merchandise made for it, by well-known quality manufacturers, to its specifications of style, materials, workmanship and the like, and carries its labels, sometimes together with those of the manufacturer, on the goods. Most of its sales are made out of the New Jersey stores, and it does make interstate sales primarily via a mailing list to which it mails catalogs periodically. Exhibits marked at the original hearing, at discovery, and during several trial dates, include such catalogs going back at least to 1961. The articles of apparel are "suited" to all parts of the body from head to toe, from hats to shoes. A separate shoe store was opened in 1969.

Attempts to catalog or tabulate the volume of sales in different parts of the country have shown limited data. The "Rolodex" list, reproduced and provided for Natural's analysis, shows customers formerly in New Jersey who have moved elsewhere, whose new addresses are recorded, and who continue to receive catalogs. What cannot be determined is the number and activity of these customers who, on one or another trip to New Jersey to visit friends or relatives, or to attend sports events, or reunions with classmates, and the like, go to the New Jersey stores and make purchases while they are here. If there are any such patrons, their numbers do not appear and so the analyses show, at most, a minimum or floor. Others outside New Jersey have asked to be put on the mailing list.

The critical date for the purposes of this suit is May 14, 1973, when Natural filed to register "Roots" as a trademark in Canada, issuance being on December 7, 1973. The first U.S. application was filed August 13, 1973 and registered October 15, 1974, for "Footwear—Namely, Shoes, Slippers and Boots—in Class 39 (Int.Cl. 25)," No. 995,-

891. The benefit of the earlier Canadian date is by treaty, and there is no dispute on the point.

The second U.S. application was filed August 22, 1973, registered April 8, 1975 for the same category, No. 1,008,601. The only difference is that the second registration uses, in addition to the word "roots" (in lower case letters) a figure of a beaver in an extended semicircle, with the words "NATURAL FOOTWEAR" in smaller and finer line, below. The suit here only relates to the word "ROOTS" in either form.

Natural started up business in Canada sometime in or after 1973. The deposition testimony of Don Green, as well as the Budman affidavit, Exh. A–3, indicate that the first shipment of shoes with the claimed trademark was on December 14, 1973. The Green deposition also indicates that a store opened in Berkeley, California under the name "Roots Natural Footwear Store" sometime between December 25, 1973 and January 10, 1974. Other stores opened in 1974 and thereafter, one being a store at 118 E. 59th Street, New York City.[1]

It was in connection with inquiries about an ad run by Natural's New York City store that the existence of Natural came to Roots' attention in 1975. Perry Root tried to identify the principal and eventually wrote a letter of objection to a Mr. Novak who he understood was manager of that store, Roots Exh. 16. Some weeks later, he received a phone call from one he noted

as Mr. "Goodman", but who may have been Mr. "Budman", and discussed the risk of conflict from the use of the same name by both Natural and Roots. There is no indication that the person who phoned Mr. Root made any mention of the registration of either trademark by Natural.

Natural says that on June 2, 1977, Roots filed with the U.S. Patent and Trademark Office [PTO] a petition for cancellation of Natural's two registrations. More than two years later on October 12, 1979, Natural filed the present complaint seeking (among other things) the relief under Count 1 which is now the subject of the cross-motions for summary judgment.

For reasons not known, the proceeding in the PTO was evidently not processed between June of 1977 and October of 1979. At one of the various hearings in this case, the court recalls being told that the PTO proceeding was awaiting the outcome of this case, although at the time of the ruling on the preliminary injunction (December 4, 1979) there had evidently not been any suggestion of that, as the ruling was expressly limited to articles of clothing "other than shoes, since the dispute about shoes is pending before the Trademark Trial and Appeals Board in the U.S. Patent and Trademark Office, which has primary jurisdiction. . . ."[2]

It may be that the delay in the PTO was due to a vast backlog in the PTO in that period causing a severe bottleneck, see

1. By affidavit of Don Green filed December 4, 1979, it appears that Natural applied "ROOTS" to products other than shoes on or about the following starting dates:

| March, 1975 | Rain and Stain |
| April, 1975 | Carrier Bag; Pens |
| August, 1975 | Saddle Soap; Mink Oil |
| October, 1975 | Shoe Polish |
| November, 1975 | Scarf |
| 1975 | T-Shirt |
| 1976 | Handbag |
| 1976 | Belt |
| 1976 | Sweatshirt |
| 1976 | Woolen sweaters; woolen socks |
| 1978 | Sheepskin vests |

By affidavit of Elizabeth Baer filed November 5, 1980 as the bookkeeper of Natural since August, 1974 it was explained that the records were and are kept manually and are in Toronto.

Sales figures are kept without segregation by area, such as the U.S., and a separate review was needed to compile those figures, some of which are estimated. From Exh. 1 to that affidavit, it appears that sales volume from 1974 to 1978 in the categories shown was:

| | 1974 | 1978 |
|---|---|---|
| Shoes | $847,625. | $1,791,872. |
| Accessories | 2,815. | 79,151. |
| Bags | 9,182. | 3,796. |
| Clothing | (no entry) | (no entry) |

2. The preliminary injunction did not apply to shoes for that reason. On Natural's application, a motion panel restricted the injunction as to other apparel to New Jersey and New York, but the merits panel affirmed and expressly did so without geographic limitation.

hearings of January 24 and March 12, 1980, in "Independent Patent and Trademark Office Act, Joint Hearings on S.2079" before the Committee on Government Affairs and the Committee on the Judiciary, 96th Cong., 2nd Sess.

In any event, although the court would ordinarily be inclined to defer to PTO, the existence of authority to deal directly with the question by virtue of 15 U.S.C. § 1119, and the agreement of the parties that it should do so in the face of the inaction at the agency, persuades it to proceed.

The controlling section of the statute is 15 U.S.C. § 1052, and, in particular, subsection (d). The format of the section directs that no "trade-mark" by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature "UNLESS".

There then follow five subsections (a) through (e) which identify categories of trademarks to which one or another subsection stands as a bar to registration, and subsection (f), which deals with a matter of prima facie evidence.

To illustrate, under (a) a trademark consisting of immoral, deceptive, or scandalous matter is barred. So also is one consisting of matter that may disparage, or falsely suggest a connection with persons "living or dead", or institutions, beliefs, or national symbols, or bring them into contempt or disrepute.

The flag, coat of arms or insignia (or similation thereof) of the United States, of any State or municipality, or of any foreign nation, is matter barred from registration under (b).

Subsection (c) bars use of the name, portrait or signature "identifying a particular living individual" except by his written consent [see, e.g., *Edison v. Edison Polyform, etc.*, 73 N.J.Eq. 136, 67 A. 392 (Ch. 1907)], or the name, signature or portrait of a deceased President of the United States during the life of his widow without her written consent.

■ Subsection (d), the one of interest here, bars registration when the trademark applied for consists of or comprises a mark which so resembles:

... a mark registered in the PTO, or

... a "mark" OR a "trade name" previously used in the United States by another, and not abandoned,

as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive.[3]

There then follows a proviso authorizing issuance of concurrent registrations on the basis of a determination that confusion, mistake or deception "is not likely to result from the continued use by more than one person of the same or similar marks" under specified conditions. The proviso is not involved in the present cross-motions, which are directed to the propriety of the registrations by Natural, and the claim of Roots that they should be cancelled.[4]

The argument is a matter of law and centers on the question whether Natural's mark was barred from registration under (d) in the face of Roots' earlier use, not

---

3. The subsection provisions of 15 U.S.C. § 1052 which are specified by Congress as barring registration evidently reflect a variety of purposes or objectives, some of which are of a regulatory nature to protect the public interest as Congress perceives it, others of which are designed to protect privacy or existing business or property interests, and others, of which seem to have mixed purposes. The specific part of subsection (d) involved here is evidently a reflection of such mixed purposes, just as the widely recognized principles of unfair competition are designed to protect the public from avoidable confusion, mistake or deception and, at the same time protect a manufacturer or merchant against unethical diversion of sales. National policy thus encourages competition but insists that the competition be fair.

4. Natural's two registrations are territorially unrestricted. In theory, if valid, they could bar Roots use of its name or label not only in shoes, but also in other articles of apparel some of which are sold regularly to Filene's in Boston for sale there under the Roots name. See Tr. 11/1/79, p. 59. See also reported decisions on related categories of goods, infra.

only for shoes but for other articles of clothing as well.[5]

■ Natural claims that the bar does not operate unless Roots can show not only that it used "Roots" for footwear before May 14, 1973 but also that it had acquired "secondary meaning" before that date, throughout the United States, "for footwear".

Roots takes the position that the bar of (d) arises without the need for it to establish secondary meaning.

Of the two positions, the court is satisfied that the one taken by Roots is clearly correct, and so its cross-motion for summary judgment will be granted, and Natural's motion will be denied.

This result follows from the clear language of the statute, in which Congress used specific statutory terms and words defined by it in 15 U.S.C. § 1127.

■ Senior use bars registration whether the senior use be an unregistered "mark" or a "trade name", so long as the senior use was in the United States and has not been abandoned, when registration would be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive. Here, the two are the same—both are "ROOTS". Roots has not used the earlier possessive form "Root's" since 1969 or 1970 (Tr., 3/14/73, p.

7, lines 3–4). The contract of sale in 1965 to Hart, Schaffner & Marx, Root Exh. P–2 at the deposition 3/12/82, submitted by Natural in support of its motion provides in Paragraph Fourth (d):

"That the Purchaser shall have acquired the exclusive right, use and possession of the name Root's Inc., or some similar name acceptable to the Purchaser."

■ The corporate subsidiary which is defendant here is "ROOTS, INC.", with no apostrophe. Even were this not so, it would be a difference of no matter. Stores known as Macy's or Wanamaker's or Bamberger's, or Robinson's, or Gimbel's or Sears, commonly are used interchangeably without the apostrophe by the general public. It makes not a scintilla of difference in terms of likelihood of confusion, mistake or deception.[6]

The word "mark" includes any trademark, service mark, collective mark or certification mark entitled to registration "whether registered or not."

The term "trade name" includes individual names and surnames, firm names and trade names used by ** "merchants" ** to identify their businesses, as well as the names or titles lawfully adopted and used by * * * "corporations" * * * engaged in

5. The operation of Roots goes back to 1917 when Perry Root's father began it. From 1950 on, when Perry Root went into the business he has worked to change the policy from one of purveying merchandise under the name of the manufacturer to making it a private label store to strengthen the name Roots. See Tr. 10/31/79, p. 5 line 22 to p. 6, line 7. The seniority time span is large, rather than close as in *Alfred etc. v. Alford etc.*, infra or as in *Dynamet*, infra.

6. Some merchants who are large enough market many products with their own "house label", made for them to their specifications by manufacturers in particular lines of business. They are large enough to change manufacturers if they choose, even though the house label remains the same. See the discussion of this in the patent infringement context where it may be vital for the patentee to sue such a "customer" for infringement rather than the manufacturer

of the moment, in *Dicar, Inc. v. L.E. Sauer Machine Co.*, 530 F.Supp. 1083, at 1090 (D–N.J. 1982).

Nor is such a merchant limited to a single house label. It is well known to be the subject of judicial notice that Sears, Roebuck & Co. has used names or marks such as "Coldspot" (refrigerators, air-conditioners); "Silvertone" (radios); "Kenmore" (stoves, ovens, dishwashers, clothes washers and driers, electric irons, food mixers, toasters, can openers, carpet sweepers); "Harmony House" (sheets, blankets); "Homart" (water heaters); "Craftsman" (workshop and garden tools and machines, snow blowers, kitchen knives). Montgomery Ward, on the other hand, largely uses the house label "Signature" for many items of like nature.

The evidence so far adduced indicates that Roots engages in this practice for some of its goods by using house names such as "Summit" for a particular model of suit made and sold as a Roots suit.

trade or commerce and capable of suing and being sued in a court of law.[7]

The term "trade-mark" includes any word or name to identify the goods of

   ... a manufacturer to distinguish them from those manufactured by others, or of

   ... a merchant to distinguish them from those sold by others.[8]

Senior use of a trade name will therefore bar registration of a trade-mark under the conditions of subsection (d) without regard to "secondary meaning".

Secondary meaning, when pertinent, may be an essential element to show on an application to register, but it has no significance in law for the bar of subsection (d).

The ruling does not address the question whether Roots, or Hart, Schaffner & Marx, has or will be able to show secondary meaning. If relevant to the remaining issues, that will be a matter for trial.

The precedents dealing with the point are in agreement. See *Ford Motor Co. v. Ford,* 462 F.2d 1405, 59 C.C.P.A. 1124 (CCPA, 1972); *Blanchard Importing etc., v. Chas. Gilman etc.,* 353 F.2d 400 (CA–1, 1965) (right to cancellation not limited to prior use of technical trademark; any prior use of a name or word is sufficient where the prior user is injured by the registration); *Dynamet Technology v. Dynamet,*

*Inc.,* 593 F.2d 1007 (Cust. & Pat.App., 1979) (period of *trade name* use of a word may be tacked on to its first date of *trademark* use to establish priority in an interference); *Alfred Electronics v. Alford Mfg. Co.,* 333 F.2d 912, 51 C.C.P.A. 1533 (CCPA, 1964) (the resembling trade name which bars registration need not be inherently distinctive or have acquired secondary meaning).

Cases like *Scott Paper Co. v. Scott's Liquid Gold, Inc.* 589 F.2d 1225 (CA–3, 1978) are not in point primarily because of the difference in product. Also, in *Scott,* plaintiff saw the mark applied for when it was published for opposition purposes, asked for and received an extension of time to file, but decided not to. Finally, both names had originally begun as surnames. But, c.f. *Hunt Foods etc. v. Gerson Stewart Corp.,* 367 F.2d 431, 54 C.C.P.A. 751 (CCPA–1966) ("HUNT" denied registration for general purpose cleaning compounds as against plaintiff's senior use for canned food products).[9]

   ■ Nor is *N. Hess & Sons, Inc. v. Hess Apparel, Inc.,* 216 U.S.P.Q. 721 (D–Md., 1982) pertinent. While the suit was under the Lanham Act, it was under § 43(a), 15 U.S.C. § 1125(a), for false designation of origin, etc., which is governed by essentially the same principles as unfair competition

---

7. The corporate name "Roots, Inc." fits this definition as does the single word or name "Roots."

8. This definition is written here in physically divided style to make clear that Congress intends a "trade-mark" to include not only the means used by a manufacturer to distinguish his goods from those manufactured by others, but also used by a merchant to distinguish his goods from those sold by others. It is very common, for instance, for men's hats to carry the maker's name on the crown lining (if there is one) and on the leather sweatband inside, but also to have embossed on the sweatband the name of the merchant who sold it. This is more than advertising, for it identifies source indisputably and is a valuable feature for the customer seeking correction or adjustment for a defect.

9. Neither the *Holiday Inn* case, 409 F.2d 614 (CA–3, 1969), nor the *Weiner King* case, 192 U.S.P.Q. 353 (CA–3, 1976); 615 F.2d 512 (Cust. & Pat.App., 1980) applies here. Both involved enterprises of a nature such that revenue from a patron or customer could be derived *only* from the physical presence of the person at the specific location. A hotel cannot derive revenue unless the patron goes to the hotel (whether to rent a room or use other facilities). The same is true of the typical "fast food" counter operation selling hot dogs. This element is obvious from a reading of both cases, especially since the *Holiday Inn* case affirmed plaintiff's superior claim to the name but postponed injunctive relief until such time as it opened a hotel in the Virgin Islands. Those familiar with St. Thomas and with the case are aware that Holiday Inn did build a hotel there, but chose to call it Frenchman's Reef, leaving the junior user where it was.

While this element is doubtless present here for major items such as men's suits, it is not present at all for items of apparel easily sold by mail. Nor is it present for those Roots goods sold by its label to other merchants elsewhere, such as Filene's in Boston, for sale by them there.

cases under State law in most instances. See, e.g., *SK & F Co. v. Premo, etc.*, 625 F.2d .1055, at 1065–6 (CA–3, 1980). There was no trade-mark registration involved even though both Hess family businesses had been conducted ·for generations in adjoining areas of Maryland (metropolitan Baltimore and Eastern Shore), and leased stores in the same shopping center in Cockeysville, with a Sears and a Bambergers store as the major tenants. There is no mention or discussion of 15 U.S.C. § 1052(d). Also, the court understands the case was appealed a year ago but no ruling had come down.[10]

So far as similarity or relationship of the goods, the court notes that Natural's argument, discussed above, is specifically directed to Roots' use on footwear or shoes, wholly ignoring the extensive record already compiled in respect to labels affixed to other kinds of apparel for a very long time.

The reported cases indicate that exact identity of goods is not required for the bar of § 1052(d) to operate. Examples are:

*R.H. Macy & Co. v. H.W. Carter & Sons*, 12 F.2d 190, 56 U.S.App.D.C. 249 (CA–DC, 1926) (senior use of "Irontex" for hosiery precluded its registration for coats).

*Cluett, Peabody & Co. v. Wright*, 46 F.2d 711 (Cust. & Pat.App., 1931) (senior use of "Arrow" for shirts and collars precluded use of "Air-O" for belts).

*Re Keller etc.*, 81 F.2d 399, 23 C.C.P.A. 837 (CCPA, 1936), cert. den. 298 U.S. 656, 56 S.Ct. 676, 80 L.Ed. 1382 (senior registration of "Timely" for *shoes* precluded junior registration for *men's clothing*.)

*Jos. S. Cohen etc. v. Hearst etc.*, 220 F.2d 763, 42 C.C.P.A. 836 (CCPA, 1955) (senior use of "Good Housekeeping" as a certification mark on products advertised in magazine precluded registration of "Good Housekeeper" on dresses, frocks, pajamas, etc.).

*General Shoe Corp. v. Lerner Bros.*, 254 F.2d 154, 45 C.C.P.A. 872 (CCPA, 1958) (senior use of "Holiday" for men's boots and *shoes* barred use of same word on men's *sport shirts* ).

*General Shoe Corp. v. Hollywood-Maxwell Co.*, 277 F.2d 169, 47 C.C.P.A. 933 (CCPA, 1960) (senior registration of "Ingenue" for women's *shoes* barred registration ˙ of same word for *brassieres* ).

*Carlisle Shoe Co. v. S.A. Roger Fare*, 278 F.2d 519, 47 C.C.P.A. 966 (CCPA, 1960) (senior registration of mark "Mademoiselle" for ladies' *shoes* precluded registration of "Le Gant Mademoiselle" for ladies *gloves*).

*Application of Apparel, Inc.*, 366 F.2d 1022, 54 C.C.P.A. 733 (CCPA, 1966) (Senior mark "Peaches and Cream" for towelling barred later registration of "Peaches 'n' Cream" for children's dresses).

Submit order granting Roots' cross-motion and denying Natural's motion, but without direction to the PTO to cancel, since the ruling is a partial disposition and there are other issues for trial, and the decision is subject to revision before the entry of final judgment, F.R.Civ.P. 54(b).

---

10. The commonest solution to the problem faced by a junior entrant faced by an existing user with considerable seniority is the usual business decision of selecting another name as soon as possible and concentrating on sales rather than litigation. From what is in the record so far, Natural seems to have selected "Roots" to convey an association with the negative-heel "Earth" shoe. It could have switched to "ANTAEUS", the name of Neptune's son whose strength was invincible while he stayed in contact with the Earth.